IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Dedra Denise Jenkins, | ) | C/A No.: 1:14-4880-JMC-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Carolyn W. Colvin, Acting | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civ. Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the undersigned recommends that the Commissioner's decision be reversed and remanded for further proceedings as set forth herein.

I.      Relevant Background

A.      Procedural History

On March 19, 2010, Plaintiff protectively filed applications for DIB and SSI in which she alleged her disability began on December 1, 2008. Tr. at 161, 162, 309–15,

316–19. Her applications were denied initially and upon reconsideration. Tr. at 198–202, 211–12, 213–14. On March 14, 2012, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Tracy Daly. Tr. at 52–115 (Hr'g Tr.). The ALJ issued an unfavorable decision on May 9, 2012, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 165–93. On July 25, 2013, the Appeals Council reviewed the claim and remanded it to the ALJ with instructions to update the record and obtain any available additional evidence concerning Plaintiff's impairments from her treating sources; further evaluate Plaintiff's mental impairments in accordance with the special technique described in 20 C.F.R. §§ 404.1520a and 416.920a; give further consideration to Plaintiff's maximum RFC and provide appropriate rationale with specific references to evidence of record in support of the assessed limitations; and, if warranted by the expanded record, obtain supplemental evidence from a VE to clarify the effect of the assessed limitations on Plaintiff's occupational base and resolve any conflicts between the occupational evidence provided by the VE and information in the *Dictionary of Occupational Titles* ("*DOT*") and the *Selected Characteristics of Occupations* ("*SCO*"). Tr. at 194–97. A second hearing was held before ALJ Daly on May 6, 2014. Tr. at 116–57. The ALJ issued an unfavorable decision on June 13, 2014, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 14–37. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–4. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on December 29, 2014. [ECF No. 1].

B.    Plaintiff's Background and Medical History

1.    Background

Plaintiff was 32 years old at the time of the first hearing and 34 years old at the time of the second hearing. Tr. at 54, 160. She completed some college. Tr. at 144–45. Her past relevant work ("PRW") was as a cashier, a telemarketer, a customer service representative, and a security guard. Tr. at 105–06. She alleges she has been unable to work since December 1, 2008. Tr. at 57.

2.    Medical History

Plaintiff was admitted to University of Tennessee Memorial Hospital on October 20, 2008, for dyspnea, abnormal electrocardiogram ("EKG"), accelerated hypertension, nocturnal cough, uncontrolled diabetes mellitus, hypokalemia, morbid obesity, probable obstructive sleep apnea, and cardiomegaly. Tr. at 477. She was discharged the following day with instructions to increase her physical activity, follow a low-fat diet, follow up with her physician, and obtain a sleep study. Tr. at 478.

On January 26, 2009, Plaintiff presented to Barnwell County Hospital with pelvic pain. Tr. at 790. An ultrasound revealed Plaintiff's uterus to be enlarged due to fibroids. *Id.*

Plaintiff presented to the emergency room ("ER") at Aiken Regional Medical Center ("ARMC"), for significantly-elevated blood pressure on June 25, 2009. Tr. at 582. She indicated she had previously taken Diovan for hypertension, but had run out of the medication. *Id.* A chest x-ray showed mild cardiomegaly. Tr. at 583.

3

On December 28, 2009, Plaintiff complained to Dennis M. Marcus, M.D. ("Dr. Marcus"), that she had experienced an episode of reduced visual acuity after Thanksgiving, but that her vision had return to normal after a week. Tr. at 615. Plaintiff's vision was 20/20 in both eyes without correction. *Id.* Her near-vision was 20/25 in both eyes. *Id.* Dr. Marcus assessed proliferative diabetic retinopathy in both eyes and possible sleep apnea. Tr. at 616. He recommended Plaintiff control her lipids, glucose, hemoglobin A1C, hypertension, and weight and that she exercise and follow up with her physicians regularly. Tr. at 617. He also advised her to undergo panretinal photocoagulation. *Id.* Plaintiff returned to Dr. Marcus for treatment on December 31, 2009, January 25, 2010, February 4, 2010, and May 6, 2010. Tr at 622–27. Dr. Marcus administered Avastin injections to Plaintiff's right eye on May 6, 2010, and to her left eye on May 13, 2010. Tr. at 630, 634.

On January 19, 2010, Plaintiff reported to Margo Hein Muniz, M.D. ("Dr. Muniz"), that she was experiencing pain from uterine fibroids. Tr. at 607. Plaintiff indicated that she desired to become pregnant and questioned Dr. Muniz regarding possible procedures to treat her uterine fibroids. *Id.*

Lab work on January 27, 2010, indicated Plaintiff to have high direct low density lipoprotein ("LDL") cholesterol and hemoglobin A1C. Tr. at 610. An ultrasound of Plaintiff's kidneys was normal on February 1, 2010. Tr. at 573.

On February 10, 2010, Plaintiff indicated to Dr. Muniz that she was not taking her medications and that she wanted to have a baby. Tr. at 605. Dr. Muniz warned Plaintiff

about her hypertension and increased her dosage of Lisinopril. *Id.* Plaintiff presented to the ER at ARMC for hypertension the same day. Tr. at 572.

On February 17, 2010, Plaintiff presented to Preston D. Conger, Jr., M.D. ("Dr. Conger"), for hypertension. Tr. at 651. She reported her diabetes had previously been treated with insulin, but she had not taken insulin since 2003 or 2004. Tr. at 651. She denied chest pain, shortness of breath, palpitations, or peripheral edema. *Id.* Dr. Conger observed a split S2 consistent with right bundle branch block, no S3, and faint systolic murmur on cardiac examination. Tr. at 650. He noted it was a little difficult to feel Plaintiff's pulses. *Id.* An EKG suggested right ventricular hypertrophy possibly related to sleep apnea and morbid obesity. *Id.* Dr. Conger indicated he could not exclude an old inferior myocardial infarction or congenital heart defect. *Id.* Lab work showed uncontrolled metabolic syndrome with elevated lipids and A1C, as well as iron-deficiency anemia. *Id.* Dr. Conger diagnosed refractory hypertension; abnormal EKG, suggesting right ventricular hypertrophy; probable mild iron-deficiency anemia; and uncontrolled diabetes and lipids. Tr. at 651. Following the visit, Dr. Conger wrote a letter to Dr. Muniz advising her of his treatment and encouraging her to refer Plaintiff for a sleep study. Tr. at 658.

Plaintiff presented to R. Bauer Vaughters, III, M.D. ("Dr. Vaughters"), for diabetes management on March 10, 2010. Tr. at 736. Plaintiff's blood pressure was elevated and Dr. Vaughters increased her dosage of Hydrochlorothiazide. *Id.* He discontinued Plaintiff's prescription for Actos and instructed her to follow up in two weeks to determine treatment. *Id.*

An echo-Doppler report on March 23, 2010, showed a scarred and akinetic left inferior wall, possible hypokinesis of the apex and a portion of the lateral wall, mild-to-moderately-reduced ejection fraction, borderline left arterial enlargement, thickening of the pericardium with possible "sliver" effusion, and no intracavitary mass or thrombi. Tr. at 543–44. On March 24, 2010, a treadmill exercise test demonstrated moderately-severe functional aerobic impairment, primarily due to deconditioning. Tr. at 542. Dr. Conger indicated the test showed no exercise-induced ischemia. *Id.*

Plaintiff followed up with Dr. Vaughters on March 25, 2010. Tr. at 735. Dr. Vaughters noted that Plaintiff had done a good job with weight loss. *Id.* He prescribed Amaryl. *Id.*

Plaintiff presented to Douglas A. Stahura, D.O. ("Dr. Stahura"), for an initial evaluation regarding proteinuria on March 29, 2010. Tr. at 518. Plaintiff indicated she was not following her diet appropriately because she did not understand dietary principles. *Id.* She denied exercising regularly or checking her blood sugars. *Id.* Dr. Stahura noted no abnormalities on examination, and Plaintiff complained of visual impairment, but denied all other symptoms. Tr. at 518–20. Dr. Stahura assessed stage three chronic kidney disease, proteinuria, hypertension, anemia, vitamin D deficiency, coronary artery disease, and chronic renal failure. Tr. at 520–21. He prescribed multiple medications and instructed Plaintiff to follow up in three months. Tr. at 521–22.

On April 7, 2010, Plaintiff underwent a myocardial perfusion imaging study that showed a severe defect involving her apex and inferior wall that was partially reversible.

Tr. at 534–35. It also indicated Plaintiff had normal left ventricular function and a fixed basal inferior defect. Tr. at 535.

On April 20, 2010, Dr. Conger reported that he spoke with Dr. Arthur, who reported that Plaintiff's nuclear stress test was very abnormal and that an echocardiogram indicated a probable old inferior myocardial infarction and hypokinesis of the apex. Tr. at 648. Dr. Conger indicated he suspected Plaintiff had significant coronary artery disease related to her history of diabetes and hypertension. *Id.* He recommended Plaintiff undergo cardiac catheterization and noted she may require intensive medical treatment, stent, and/or surgery. *Id.*

On April 21, 2010, Plaintiff experienced an episode of nausea and vomiting while visiting Dr. Conger. Tr. at 647. She reported nausea and vomiting two to three times per week over the prior two-year period, but stated she usually felt fine after vomiting. *Id.* Plaintiff denied shortness of breath and chest pain and indicated she generally felt well. *Id.* Dr. Conger referred Plaintiff for lab work and recommended Plaintiff increase her dosage of Carvedilol, continue taking Crestor, and discontinue Diltiazem and Pravastatin. *Id.*

Plaintiff followed up with Anselmo L. Arthur, M.D. ("Dr. Arthur"), on April 21, 2010, and denied chest pain, but complained of shortness of breath with exertion. Tr. at 531. On April 27, 2010, the left heart catheterization showed at least single-vessel coronary artery disease with a lesion in the left anterior descending artery. Tr. at 539. Dr. Arthur recommended medical therapy as opposed to surgery for the lesion. *Id.* He also

indicated Plaintiff needed better blood pressure control to treat diastolic dysfunction. *Id.* Plaintiff's left ventricular ejection fraction was 50 percent. Tr. at 541.

On May 24, 2010, Plaintiff indicated to Dr. Arthur that she was doing well and had no chest pain or shortness of breath. Tr. at 641. Dr. Arthur indicated Plaintiff's coronary artery disease was stable and that she should continue Crestor and return for follow up in six months. Tr. at 642.

Plaintiff also visited Dr. Muniz on May 24, 2010. Tr. at 787. Dr. Muniz instructed Plaintiff that pregnancy would further compromise her health. *Id.* She indicated the Zoladex injections had reduced the size of Plaintiff's uterus and that Plaintiff would like to continue with the injections and avoid surgery, if possible. *Id.*

On May 28, 2010, Dr. Vaughters instructed Plaintiff to discontinue Januvia and to start Byetta. Tr. at 733. Plaintiff's A1C had decreased from 10.7 to 9.9. *Id.*

Plaintiff followed up with Dr. Conger on June 7, 2010, and reported no chest pain, increased shortness of breath, syncope, presyncope, myalgias, or abnormal bleeding. Tr. at 645. Dr. Conger indicated Plaintiff was relatively stable and that she should continue her current regimen. *Id.* He discharged her as a patient and instructed her to follow up with Dr. Arthur. *Id.*

Plaintiff followed up with Dr. Muniz on June 30, 2010. Tr. at 786. She reported her pain had decreased and that she was feeling full and eating less since starting her prescription for Byetta. *Id.* Dr. Muniz noted that Plaintiff needed to see a dietician. *Id.*

On July 1, 2010, Plaintiff reported to Dr. Marcus that her visual acuity was "good" and Dr. Marcus found her condition to be stable. Tr. at 699.

On July 14, 2010, state agency medical consultant Michael Perll, M.D., reviewed Plaintiff's records and completed a physical residual functional capacity ("RFC") assessment. Tr. at 679–84. He found that Plaintiff could frequently and occasionally lift and/or carry 10 pounds; stand and/or walk for about six hours in an eight-hour workday; and sit for about six hours in an eight-hour workday. *Id.*

On September 1, 2010, Dr. Muniz had a lengthy discussion with Plaintiff regarding pregnancy and advised Plaintiff that pregnancy could be very dangerous to her health. Tr. at 716. She noted Plaintiff's fibroids had responded well to Zoladex injections. *Id.*

On September 30, 2010, an optical coherence tomography report indicated minimal non-central macular edema and quiescent proliferative diabetic retinopathy. Tr. at 698. Lab work indicated elevated hemoglobin A1C, creatinine, and blood urea nitrogen ("BUN"). Tr. at 712.

On November 1, 2010, Dr. Stahura indicated Plaintiff generally felt well and had no complaints, but had not been good with follow up or medications. Tr. at 702. Dr. Stahura observed no abnormalities on physical examination. Tr. at 702–03.

On November 2, 2010, Dr. Vaughters advised Plaintiff to discontinue Byetta and to start Victoza. Tr. at 732. He encouraged Plaintiff to work on diet and exercise and to follow up in three to four weeks. *Id.*

On November 8, 2010, an ultrasound revealed Plaintiff's uterus to be bulky, inhomogenous, and consistent with fibroids. Tr. at 721. Plaintiff had multiple large

fibroids. *Id.* Her endometrium was ill-defined and her ovaries could not be visualized due to fibroids. *Id.*

On November 15, 2010, Dr. Muniz indicated Plaintiff had a great response to Zoladex. Tr. at 782. She stated Plaintiff's hypertension was poorly-controlled, but her kidney function was stable. *Id.* She noted Plaintiff was no longer interested in becoming pregnant. *Id.*

Plaintiff followed up with Dr. Vaughters on November 16, 2010, for diabetes. Tr. at 731. She reported nausea secondary to Victoza, but her blood sugar had improved on the medication. *Id.* Dr. Vaughters indicated Plaintiff was experiencing nausea because Victoza was increased too quickly. *Id.* She advised Plaintiff to restart Victoza at a lower dose until she stopped experiencing nausea. *Id.*

Plaintiff followed up with Dr. Marcus on December 30, 2010. Tr. at 908. Dr. Marcus's examination revealed Plaintiff to demonstrate quiescent proliferative diabetic retinopathy in both eyes that was not clinically significant, as well as mild epiretinal membrane. *Id.* He noted Plaintiff's vision to be 20/20 in both eyes and recommended Plaintiff control her blood sugar and follow up in four months. *Id.*

On January 15, 2011, state agency medical consultant Warren F. Holland, M.D., reviewed the evidence and assessed Plaintiff to have the following physical RFC: frequently and occasionally lift and/or carry 10 pounds; stand and/or walk (with normal breaks) for a total of about six hours in an eight-hour workday; sit (with normal breaks) for a total of about six hours in an eight-hour workday; frequently balance; occasionally climb ramps and stairs; stoop, kneel, crouch, and crawl; never climb ladders, ropes, or

scaffolds; and avoid concentrated exposure to extreme cold and extreme heat. Tr. at 757–63.

Plaintiff presented to Dr. Muniz on January 20, 2011, and complained of pain, gastritis, gastroesophageal reflux disease ("GERD"), and chronic constipation. Tr. at 781. Plaintiff's blood glucose was 252, her blood pressure was 139/69, and her A1C was 12.1. *Id.* Dr. Muniz noted Plaintiff had vomit on her shoes and prescribed Phenergan. *Id.* She indicated Plaintiff's diabetes was poorly-controlled and that she was a terrible candidate for surgery to address her uterine fibroids. *Id.*

On January 24, 2011, Plaintiff presented to Ayaz Chaudhary, M.D. ("Dr. Chaudhary"), with complaints of upper abdominal epigastric pain, regurgitation, heartburn, solid food dysphagia, and constipation. Tr. at 765. Dr. Chaudhary noted no abnormalities on examination and indicated he would perform an esophagogastroduodenoscopy ("EGD"), refer Plaintiff for a colonoscopy and blood work, and prescribe a proton pump inhibitor. *Id.*

On February 22, 2011, a colonoscopy revealed internal, non-bleeding hemorrhoids, but was otherwise normal. Tr. at 766. A stomach biopsy showed active chronic Helicobacter pylori ("H. pylori") gastritis. Tr. at 769. An upper gastrointestinal endoscopy indicated Grade A reflux esophagitis, hiatal hernia, non-bleeding erythematous gastropathy, and a normal duodenum. Tr. at 823.

Plaintiff followed up with Dr. Vaughters on March 1, 2011. Tr. at 773. Dr. Vaughters indicated Plaintiff's A1C had decreased from 12.9 to 8.6. *Id.* Plaintiff's blood

pressure remained elevated, and Dr. Vaughters increased the dosage of her medication. *Id.* Dr. Vaughters indicated Plaintiff was doing a good job with weight loss. *Id.*

Plaintiff presented to Dr. Chaudhary on May 3, 2011. Tr. at 814. Dr. Chaudhary indicated Plaintiff should continue the medication to treat H. pylori gastritis. *Id.*

On June 7, 2011, Dr. Vaughters indicated Plaintiff should work on a ten-pound weight loss. Tr. at 772. He also prescribed Tekturna for hypertension. *Id.* Plaintiff's A1C had increased from 8.6 at her previous visit to 10.5. *Id.*

On June 13, 2011, Dr. Marcus indicated Plaintiff had a new inferior preretinal hemorrhage in her left eye. Tr. at 910. He noted that Plaintiff's left eye vision had reduced slightly to 20/25. *Id.* He administered an Avastin injection to Plaintiff's left eye and recommended Plaintiff's intraocular pressure be monitored. *Id.*

Plaintiff underwent a sleep study on June 24, 2011, which showed mild obstructive sleep apnea. Tr. at 808. Reddiah Babu Mummaneni, M.D., recommended Plaintiff obtain a continuous positive airway pressure ("CPAP") machine. *Id.*

Plaintiff presented to Dr. Muniz on July 1, 2011, with back and abdominal pain and burning during urination. Tr. at 857. Dr. Muniz diagnosed vaginitis. *Id.*

On July 6, 2011, Plaintiff tested negative for H. pylori. Tr. at 815.

Plaintiff followed up with Dr. Marcus on July 25, 2011. Tr. at 919. Dr. Marcus indicated Plaintiff had 20/20 vision in both eyes, but high intraocular pressure of 25 on the right and 28 on the left. *Id.* He recommended Plaintiff follow up with Dr. Barrett for intraocular pressure check and prescribed Xalatan to be taken at bedtime. *Id.*

On August 1, 2011, Dr. Muniz discussed with Plaintiff her diabetes and hypertension and advised her to decrease her blood sugar. Tr. at 863. She indicated Plaintiff would be receiving three additional Zoladex injections. *Id.* Plaintiff informed Dr. Muniz that she would be taking custody of three children, in addition to her daughter. *Id.*

Plaintiff followed up with Dr. Chaudhary on August 16, 2011, and indicated she had no dysphagia or other complaints. Tr. at 816.

Plaintiff was admitted to ARMC on September 13, 2011, after she presented to Dr. Vaughters with a blood pressure of 200/110, a headache, occasional chest pain, dehydration, difficulty keeping down fluids, and elevated blood glucose. Tr. at 825. Dr. Arthur examined Plaintiff during her hospitalization and indicated Plaintiff's blood pressure was "not terribly out of control" and that she was not having unstable angina. Tr. at 827. He determined Plaintiff should continue with the medications that were previously prescribed. *Id.* Plaintiff was discharged on September 24, 2011, after her blood pressure and blood sugar improved with oral medications. Tr. at 838. Dr. Vaughters noted that Plaintiff was administered the same medications in the hospital that she was prescribed at home and that he suspected compliance was an issue. *Id.* He indicated a need to "stress to her the need to take her medications as directed." *Id.*

Plaintiff followed up with Dr. Vaughters on September 20, 2011. Tr. at 849. She voiced no new complaints, and Dr. Vaughters noted that her blood sugars had improved. *Id.*

On September 22, 2011, Dr. Arthur noted no abnormalities during a cardiac examination, and Plaintiff's blood pressure was well-controlled at 110/78. Tr. at 853. Dr. Arthur instructed Plaintiff to follow up in six months. *Id.*

Plaintiff followed up with Dr. Stahura on September 23, 2011, and Dr. Stahura indicated her chronic kidney disease was stable and her hypertension was well-controlled. Tr. at 877–78. He instructed Plaintiff to follow up in six months. Tr. at 878.

On October 27, 2011, Dr. Marcus observed Plaintiff to have a mild increase in macular edema and recommended glucose control. Tr. at 922.

On November 17, 2011, Dr. Muniz indicated Plaintiff's fibroids continued to be improved by Zoladex. Tr. at 872. Plaintiff again indicated to Dr. Muniz that she desired to become pregnant, and Dr. Muniz again advised against it. *Id.*

Plaintiff followed up with Dr. Muniz on March 6, 2012. Tr. at 876. She reported decreased pain from fibroids following Zoladex injections. *Id.* Dr. Muniz encouraged Plaintiff to be compliant with her diabetes treatment. *Id.*

Lab tests conducted on March 29, 2012, revealed multiple abnormalities, including high glucose, hemoglobin A1C, creatinine, triglycerides, and BUN and low carbon dioxide, estimated glomerular filtration rate ("GFR"), and high-density lipoprotein ("HDL") cholesterol. Tr. at 991.

On April 4, 2012, Plaintiff reported weight gain/obesity, fatigue, edema, claudication, and leg pain to Dr. Vaughters. Tr. at 883. Dr. Vaughters observed no abnormalities on physical examination. Tr. at 884. He diagnosed hypertension, mixed hyperlipidemia, uncontrolled type II diabetes mellitus, malaise/fatigue, peripheral

vascular disease, anxiety, depressive disorder, and abnormal weight gain and ordered multiple lab tests. *Id.* He instructed Plaintiff to check and record her blood sugar twice a day and to bring her recordings to her next visit. Tr. at 885.

On May 14, 2012, Plaintiff complained to Dr. Vaughters of hot flashes, hypoglycemia, difficulty sleeping, chest pressure, dyspnea on exertion, and anxiety. Tr. at 891. Dr. Vaughters noted obesity and thyromegaly, but the physical examination was otherwise normal. Tr. at 892. He diagnosed Plaintiff with a urinary tract infection ("UTI") and prescribed Cipro and Diflucan. *Id.* Plaintiff's A1C was 11.6, and Dr. Vaughters increased her Levemir dosage to 24 units at bedtime. *Id.*

Dr. Vaughters monitored Plaintiff's blood glucose through a continuous glucose monitoring system ("CGMS") between May 15 and 18, 2012. Tr. at 900. The CGMS evaluation showed no hypoglycemia, but significant fasting and postprandial hyperglycemia. Tr. at 894, 900.

Plaintiff followed up with Dr. Vaughters on May 29, 2012, and reported good energy, but difficulty sleeping, claudication, cough, leg pain, and dizziness. Tr. at 902. Dr. Vaughters observed Plaintiff to be obese and to have thyromegaly, but noted no other abnormalities on examination. Tr. at 903. He indicated Plaintiff's blood glucose was much improved and that she should continue to keep a blood sugar log and to follow up in three months. *Id.*

On June 8, 2012, Plaintiff reported to Dr. Muniz that she was experiencing recurrent symptoms of UTI. Tr. at 993. She indicated her blood sugars had improved over the prior two to three week period. *Id.* Plaintiff followed up with Dr. Muniz regarding her

lab work on June 18. Tr. at 996. Dr. Muniz indicated Plaintiff's diabetes was poorly-controlled. *Id.* She also indicated Plaintiff was having shorter and lighter menstrual cycles on Zoladex injections, but that Plaintiff continued to complain of pain and increased cramps. *Id.*

Plaintiff presented to the ER at ARMC on July 9, 2012, for pain in her back, legs, and abdomen. Tr. at 954. She was diagnosed with a UTI. Tr. at 956.

On October 4, 2012, Dr. Muniz indicated Plaintiff had brittle diabetes. Tr. 997. She suggested Plaintiff's blood sugar was poorly controlled and that Plaintiff was not checking her sugar adequately. *Id.* Plaintiff complained of UTI-like symptoms and Dr. Muniz sent her urine for a culture. *Id.*

On October 11, 2012, Dr. Marcus assessed non-central macular edema of the left eye with quiescent proliferative diabetic retinopathy in both eyes and open angle glaucoma of both eyes with non-compliance. Tr. at 929. He instructed Plaintiff to resume Xalatan for both eyes, control her glucose, see Dr. Barrett for refraction and glaucoma, treatment, and follow up in three months. *Id.*

On October 30, 2012, Plaintiff followed up with Dr. Arthur. Tr. at 937. A physical examination was normal. *Id.* Dr. Arthur indicated Plaintiff's coronary artery disease was stable and instructed her to follow up in six to nine months. *Id.*

On December 3, 2012, an echocardiogram showed mild concentric left ventricular hypertrophy, normal left ventricular systolic function with an ejection fraction of approximately 55 percent, trace mitral regurgitation, trace tricuspid regurgitation, and normal right ventricular systolic pressure. Tr. at 939–40.

Plaintiff presented to the ER at ARMC on December 22, 2012, complaining of pain in her lower back and abdomen that was accompanied by abdominal cramping. Tr. at 963. She was again diagnosed with a UTI. Tr. at 965.

Plaintiff followed up with Dr. Marcus on January 14, 2013. Tr. at 932. Dr. Marcus assessed proliferative diabetic retinopathy of both eyes with a mild increase in noncentral thickening in both eyes. *Id.* Plaintiff's visual acuity was indicated to be 20/30 bilaterally. *Id.*

On January 23, 2013, Plaintiff reported to Dr. Muniz that she had felt poorly for a week. Tr. at 1004. Dr. Muniz encouraged Plaintiff to keep a blood pressure log. *Id.* She indicated Plaintiff's uterus had decreased in weight by approximately 200 grams and suggested Plaintiff continue the Zoladex injections. *Id.*

Plaintiff's blood glucose was 361 during a visit to Dr. Muniz's office on February 11, 2013. Tr. at 1005. Dr. Muniz stressed to Plaintiff and her husband the need for Plaintiff to exercise, control her diet, and take her medications as directed. *Id.* Plaintiff followed up with Dr. Muniz two days later and complained of blurred vision. Tr. at 1006. Dr. Muniz again discussed Plaintiff's diet with her. *Id.* Lab work indicated Plaintiff's glucose, BUN, triglycerides, hemoglobin A1C, white blood cell ("WBC") count, potassium, creatinine, and LDL cholesterol to be elevated and her carbon dioxide and estimate GFR to be below normal. Tr. at 1007.

Plaintiff followed up with Dr. Vaughters on February 21, 2013, and reported no complaints. Tr. at 1027–28. Dr. Vaughters noted no abnormalities on examination and diagnosed uncontrolled type II diabetes, hypertension, mixed hyperlipidemia, peripheral

vascular disease, and mild stage two chronic kidney disease. Tr. at 1028. Plaintiff's hemoglobin A1C was 11.6. Tr. at 1029. Dr. Vaughters indicated Plaintiff was not checking her blood sugar. *Id.* He instructed Plaintiff to continue Metformin and Amaryl, to stop Byetta, and to start Victoza. *Id.* He also advised her to change her diet, to increase her exercise, and to stop drinking soda. *Id.*

Plaintiff underwent CGMS placement between March 1 and 8, 2013. Tr. at 1030, 1031. Dr. Vaughters noted that CGMS evaluation revealed no significant hypoglycemia, but elevated postprandial blood glucose levels. Tr. at 1031.

On March 13, 2013, Plaintiff reported to Dr. Muniz that her fasting blood sugars were typically running from 80 to 100 and that her blood pressure had improved. Tr. at 1009. Dr. Muniz encouraged Plaintiff to follow up with Dr. Vaughters for diabetes and with Dr. Stahura for renal insufficiency. *Id.* She indicated Plaintiff had mild anemia and recommended she eat more green, leafy vegetables. *Id.*

On March 18, 2013, Plaintiff followed up with Donna J. Scott, FNP-BC ("Ms. Scott") in Dr. Stahura's office. Tr. at 944. Plaintiff indicated she had recently lost eight pounds and complained of fatigue. Tr. at 945. Ms. Scott assessed proteinuria, hypertension, acidosis, hyperlipidemia, stage four chronic kidney disease, leukocytosis, uncontrolled type II diabetes, obesity, and wheezing. Tr. at 947.

On March 19, 2013, Plaintiff presented to Melvyn Haas, M.D. ("Dr. Haas"). Tr. at 934. She indicated her CPAP device was no longer working and that she had last used it in October 2012. *Id.* Dr. Haas found the device to be infested with roaches and discarded it. *Id.* Plaintiff informed Dr. Haas that she had been using her sister's old CPAP machine

18

and that she slept well with it and was able to remain awake during the day. *Id.* Plaintiff reported that she was enrolled in school and was exercising. *Id.* Dr. Haas indicated Plaintiff's gait was "rolling in keeping with her bulk" and that Plaintiff could perform a tandem walk. *Id.* He indicated he would try to obtain a new CPAP machine for Plaintiff and that Plaintiff should follow up in six weeks. *Id.*

Plaintiff followed up with Dr. Vaughters on March 27, 2013, and reported no complaints. Tr. at 1034. Dr. Vaughters noted no abnormalities on examination and indicated Plaintiff's blood glucose was more stable on Victoza. Tr. at 1035. Dr. He instructed Plaintiff to continue her current medications and follow up in four months. *Id.*

On May 30, 2013, Dr. Muniz noted that Plaintiff was in school. Tr. at 1012. She indicated Plaintiff's fibroids improved on Zoladex and that Plaintiff did not need pain medication. *Id.* However, she also noted that Plaintiff's fibroids recurred when she was not taking Zoladex. *Id.* She referred Plaintiff for lab tests that revealed a number of abnormalities, including elevated glucose, hemoglobin A1C, BUN, and creatinine. Tr. at 1013–14.

Plaintiff followed up with Dr. Arthur on June 20, 2013, and denied chest discomfort, orthopnea, proximal nocturnal dyspnea, dyspnea on exertion, edema, palpitations, syncope, near syncope, claudication, ulceration of the lower extremities, transient ischemic attack ("TIA") or stroke-like symptoms, and symptoms of valvular heart disease. Tr. at 941. Dr. Arthur observed Plaintiff to have a body mass index ("BMI") of 49.5 and to have slightly elevated blood pressure at 140/88, but noted no other abnormalities. Tr. at 941–42.

On June 27, 2013, Plaintiff requested Dr. Muniz check her for pregnancy because she had forgotten to use birth control. Tr. at 1016. A pregnancy test was negative. Tr. at 1017. Dr. Muniz noted Plaintiff's blood sugar was poorly-controlled and her blood pressure was elevated. *Id.* However, she also noted Plaintiff had lost four pounds. Tr. at 1016. On July 3, 2013, Dr. Muniz again discussed with Plaintiff the risks associated with pregnancy and urged Plaintiff to avoid pregnancy. Tr. at 1018.

Plaintiff followed up with Dr. Stahura on September 6, 2013. Tr. at 948. Dr. Stahura indicated he would obtain a renal panel to monitor acidosis and a 24-hour urine sample at Plaintiff's next visit to monitor for proteinuria. *Id.* He stated Plaintiff's hypertension was well-controlled. *Id.* He encouraged Plaintiff to follow a low fat, low cholesterol diet and to increase her physical activity to address hyperlipidemia and obesity. *Id.* He noted Plaintiff had stage four chronic kidney disease and indicated she had a significant decrease in her kidney function. *Id.*

On October 26, 2013, Dr. Muniz indicated Plaintiff had maintained a blood pressure log and that her readings were acceptable. Tr. at 1021. She noted Plaintiff had not received a Zoladex injection since June and that her fibroids were the same. *Id.* She suggested Plaintiff's frequent UTIs were likely related to her uncontrolled blood sugar. *Id.*

On November 22, 2013, Plaintiff presented to the ER at ARMC complaining of pain in her back and abdomen and foul-smelling urine. Tr. at 972. She was again diagnosed with a UTI. Tr. at 975.

On April 1, 2014, Dr. Vaughters referred Plaintiff to Dr. Paxton for decreased ankle-brachial index, pain, and tingling in her feet and hands. Tr. at 1037. He instructed Plaintiff to follow up with the nephrologist and the ophthalmologist. *Id.* On April 15, 2014, Dr. Vaughters indicated Plaintiff had not been taking Amaryl or Victoza since her last appointment. Tr. at 1038. He instructed Plaintiff to start Victoza at 0.6 milligrams, but to titrate her dosage up to 1.2 mg and then to 1.8 mg daily. *Id.* Dr. Vaughters prescribed Lovastatin and Pravastatin for Plaintiff's cholesterol. *Id.* He discussed diet and exercise with Plaintiff and congratulated her on a five-pound weight loss. *Id.* He also prescribed Wellbutrin ER 150 mg daily for depression. *Id.*

C.    The Administrative Proceedings

1.    The Administrative Hearing

a.    Plaintiff's Testimony

1.    March 14, 2012

Plaintiff testified she last worked full-time from August 2006 to December 2008 as a customer service representative in a call center. Tr. at 63. She indicated she previously worked full-time as a telemarketer, a cashier, and a security guard. Tr. at 71. She stated she performed several other jobs on a part-time basis. Tr. at 67–71.

Plaintiff indicated she stopped working because she decided to move closer to her father, after being hospitalized in Tennessee. Tr. at 72–73. She stated she was unable to work because her body ached and because her health problems would cause her to miss work. Tr. at 74.

Plaintiff testified she was 4'11" tall and that her weight fluctuated between 215 and 245 pounds. Tr. at 75. She indicated she felt pain in her legs and back that made it difficult for her to walk. Tr. at 76. She stated she experienced tiredness and often fell asleep after sitting for 20 to 30 minutes. Tr. at 76. She indicated she awoke three to four times during a typical night. *Id.* She testified her medication made her vomit every morning and sometimes during the afternoon and caused occasional headaches. Tr. at 76–77, 79. She stated she experienced some cramping in her lower back, stomach, and legs. Tr. at 79. She complained of numbness in her feet and fingertips that occurred two to three times per week. Tr. at 99–100. She indicated her vision was reduced a little. Tr. at 101. She stated she had sleep apnea and used a CPAP machine. Tr. at 102.

Plaintiff testified she had difficulty lifting and walking. Tr. at 79–80. She indicated she could stand for approximately 30 minutes at a time and would need to sit for two to three minutes after standing. Tr. at 80. She testified she could sit for an hour to an hour-and-a-half during an eight-hour workday. Tr. at 81. She stated she could sit for two hours at a time. *Id.* She indicated she could walk for 10 to 15 minutes at a time. Tr. at 81–82. She stated she used the bathroom three times during a typical morning. Tr. at 82.

Plaintiff testified she lived in a house with her nine-year-old daughter, a niece, two nephews, and her older sister. Tr. at 82. She stated she was able to dress herself, but had some difficulty putting on her socks and shoes. Tr. at 84. She indicated she was able to shower, but did not take baths. Tr. at 85. Plaintiff denied cooking and performing most household chores. *Id.* She stated she did laundry with assistance from her niece and sometimes made her bed. Tr. at 85–86. She indicated she prepared a shopping list, but did

not often go grocery shopping. Tr. at 86. She stated she went to visit friends or family members two to three times per month, but that her friends and family came to visit her more frequently. Tr. at 87. She indicated she was unable to participate in activities with her daughter or attend her daughter's school events. Tr. at 88. She stated she played games and read with her daughter. Tr. at 89. She testified she attended church every Sunday from 10:00 a.m. to 1:30 p.m. Tr. at 90–91. She indicated she spent most of her time lying down and reading. Tr. at 103–04.

Plaintiff testified her blood sugar varied, but had only been as high as 140 since she started taking her current medication. Tr. at 96. Plaintiff indicated her blood sugar was over 400 during a period when she was without one or two of her medications. Tr. at 97. She stated she sometimes experienced mild chest pain, but that her doctor told her it was not unusual. *Id.* She indicated she needed to lie down for several hours during a typical day because of pain and numbness in her right hip area. Tr. at 99.

## 2.    May 6, 2014

At the second hearing, Plaintiff testified she was working as a cashier at Reed's for 10 to 15 hours per week, where she had worked for approximately eight months. Tr. at 124. She stated she worked four days per week for a month, but had to reduce her hours because of aches, pain, and possible swelling as a result of standing. Tr. at 124–25. She indicated she worked for four to five hours at a time on two to three days per week. Tr. at 130, 135. Plaintiff testified she was unable to work seven or eight hours per day, five days per week because she had difficulty standing. *Id.* She indicated she began to feel numbness in her legs and feet after standing for 30 to 45 minutes. Tr. at 130–31. She

stated she had some difficulty grasping money and kept a sponge by her register to wet her hands and improve her grip. Tr. at 132.

Plaintiff testified her pain had worsened a little since her first hearing. Tr. at 125. She indicated she had pain in her feet that sometimes radiated to her leg and experienced swelling that sometimes affected her ability to eat. Tr. at 125–26. She described numbness and tingling in her hands. Tr. at 126. Plaintiff testified she sometimes experienced shortness of breath and infrequently felt chest pain. Tr. at 128. She stated she continued to have abdominal pain as a result of fibroid tumors and indicated her new doctor was considering surgery. *Id.* She testified she had symptoms of depression and took antidepressant medication. Tr. at 136. She indicated she experienced fatigue and tiredness during the day. Tr. at 137–38.

Plaintiff testified that she experienced sharp pain in her feet while sitting. Tr. at 133. She indicated she needed to alternate between sitting and moving around. *Id.* She stated her vision was sometimes, but not often, blurred and indicated she was most likely to experience blurred vision when constantly looking at something. Tr. at 135. She clarified that her eyes were usually a little blurry by the end of her work shift. *Id.*

Plaintiff testified that she exercised by walking for 30 minutes at a time on two days per week and had lost approximately 20 pounds since her last hearing. Tr. at 139, 147. She indicated she regularly awoke around 3:00 a.m., but tried to go back to sleep. Tr. at 140. She stated her alarm clock went off at 5:30 a.m., and she awoke and helped her daughter to get ready for school. *Id.* She indicated her daughter's bus picked her up for school between 6:20 and 6:30 a.m. *Id.* She testified she watched television, took her

24

medications, ate, and went back to sleep from 8:00 or 9:00 a.m. to 11:00 a.m. or 12:00 p.m. *Id.* She stated she then got up, picked up around the house, started dinner, washed clothes, and swept. *Id.* Plaintiff indicated her four- and eight-year-old niece and nephew no longer lived with her "because it was too much," but she indicated she cared for them on weekends. Tr. at 141.

Plaintiff testified she tested her blood sugar three times daily and indicated it was stable. Tr. at 142. She stated she ate small meals and eliminated bread to control her diabetes. Tr. at 143. She indicated she could not perform a sedentary job because she experienced sharp pain in her feet and pain upon standing. Tr. at 144. Plaintiff testified she completed three summer school courses in early childhood education. Tr. at 146.

b.    Vocational Expert Testimony

1.    March 14, 2012

Vocational Expert ("VE") Diane Regan reviewed the record and testified at the hearing. Tr. at 104–13. The VE categorized Plaintiff's PRW as a cashier, *DOT* number 211.462-010, as light with a specific vocational preparation ("SVP") of two; a telemarketer, *DOT* number 299.357-014, as sedentary with an SVP of three; a customer service representative, *DOT* number 241.367-014, as sedentary with an SVP of five; and a security guard, *DOT* number 372.667-038, as light with an SVP of three. Tr. at 105–06. The ALJ described a hypothetical individual of Plaintiff's vocational profile who could lift or carry 10 pounds occasionally and minimal amounts frequently; could stand or walk with normal breaks for a total of six hours in an eight hour day; could sit with normal breaks for a total of six hours in an eight-hour day; could push or pull, including the

operation of hand and foot controls, in a manner consistent with the limits for lifting and carrying; could frequently balance; could occasionally climb ramps or stairs, stoop, kneel, crouch, or crawl; could never climb ladders, ropes, or scaffolds; and must avoid concentrated exposure to extreme cold, extreme heat, hazardous machinery, and unprotected heights. Tr. at 106. The VE testified that the hypothetical individual could perform Plaintiff's PRW as a telemarketer and a customer service representative. Tr. at 107. The ALJ asked whether there were any other jobs in the regional or national economy that the hypothetical person could perform. *Id.* The VE identified jobs as an inspector/sorter, *DOT* number 712.687-018, with 120,000 positions in the national economy; a mail clerk/addresser, *DOT* number 209.587-010, with 60,000 position in the national economy; and a final assembler, *DOT* number 713.687-018, with 100,000 positions in the national economy. *Id.*

The ALJ next described a hypothetical individual of Plaintiff's vocational profile who was limited to only occasional bilateral fine finger manipulation. Tr. at 107–08. The VE indicated the jobs identified in response to the first hypothetical, with the exception of mail clerk, could be performed, but would be reduced to 30 percent of the numbers given. Tr. at 108.

The ALJ asked the VE to assume the individual was limited as described in the first two hypothetical questions, but to further assume the individual would be required to have the ability to alternate between sitting and standing, as needed, without being off task. Tr. at 108–09. He asked if the individual could perform any jobs. Tr. at 109. The VE testified Plaintiff's PRW would be precluded, but the individual could still perform jobs

as an inspector/sorter and a final assembler, with the reduction in numbers indicated in the response to the second hypothetical question. *Id.*

The ALJ asked the VE to assume the hypothetical individual would be off task as much as 10 minutes per hour, approximately four to five times per day, or as much as 25 percent of the work week. Tr. at 110. The VE testified the individual would be unable to engage in competitive employment. *Id.*

Plaintiff's attorney asked the VE if a need to lie down or recline during unscheduled breaks for up to two hours per day would preclude the jobs she identified. Tr. at 110–11. The VE testified that such a limitation would preclude the jobs identified and all competitive employment. Tr. at 111.

Plaintiff's attorney next asked the VE to assume the individual had no effective ability to use her hands for fine manipulation and could only occasionally perform gross handling. Tr. at 112. He asked if that would eliminate the sedentary jobs identified. *Id.* The VE testified the limitation would eliminate all sedentary jobs except the unskilled, sedentary job of surveillance system monitor, *DOT* number 379.367-010, with 60,000 positions in the national economy. Tr. at 112–13.

## 2.    May 6, 2014

VE Jacqueline Kennedy-Merritt reviewed the record and testified at the second hearing. Tr. at 148. The ALJ asked the VE to consider a hypothetical individual of Plaintiff's vocational profile who was limited as follows: could perform sedentary work as defined in the regulations; could frequently balance; could occasionally climb ramps and stairs, stoop, kneel, crouch, and crawl; could never climb ladders, ropes, or scaffolds;

must avoid concentrated exposure to extreme cold and extreme heat; must avoid even moderate exposure to hazardous machinery and unprotected heights; and could perform simple, routine, and repetitive tasks in a work environment free of fast-paced production requirements that involves only simple work-related decisions with few, if any, workplace changes. Tr. at 149. The ALJ asked if the hypothetical individual could perform any of Plaintiff's PRW. *Id.* The VE testified that the individual could not. Tr. at 150. He asked if the individual could perform any jobs that existed in the regional or national economy. *Id.* The VE testified that the individual could perform sedentary jobs with an SVP of two as an addresser, *DOT* number 209.587-010, with 15,000 positions nationally and over 200 jobs in South Carolina; a charger II, *DOT* number 700.687-026, with 50,000 positions nationally and over 300 positions in South Carolina; and a call-out operator, *DOT* number 237.367-014, with 15,000 positions nationally and over 200 positions in South Carolina. Tr. at 150–51.

The ALJ next asked the VE to assume an individual of Plaintiff's vocational profile and to further assume the individual had the following limitations in addition to those included in the first hypothetical question: would require the ability to alternate between a sitting and standing position at approximately 30-minute intervals during the day without leaving the work station or being off-task and would be limited to occupations that require only frequent, but not constant, work with objects no smaller than a small paperclip, small print, or objects that require detailed, fine visual acuity. Tr. at 151. He asked if there were jobs an individual could perform with these limitations. *Id.* The VE testified the individual could perform the addresser and call-out operator

positions. Tr. at 152. She also identified the job of waxer, *DOT* number 779.687-038, with 20,000 positions nationally and over 100 positions in South Carolina. *Id.*

For a third hypothetical question, the ALJ asked the VE to assume the individual was limited as described in the previous question, but to further assume the individual was unable to sustain sufficient concentration, persistence, or pace to do even simple, routine tasks over the course of an eight-hour workday, five-day week, and 40-hour workweek. *Id.* He asked if there were jobs an individual with such limitations could perform. *Id.* The VE testified there would be no jobs an individual with such limitations could perform. *Id.*

The ALJ asked the VE if her testimony was consistent with the information in the *DOT* and its companion publication. *Id.* The VE stated it was. *Id.* The ALJ then recognized that the *DOT* did not address the issue of a sit/stand option and the VE confirmed the same. *Id.* The ALJ asked the VE to explain the basis for her testimony with respect to the sit/stand option. *Id.* The VE testified that the information regarding the sit/stand option was based on her professional knowledge, experience, and observation of the performance of the jobs identified in response to the first and second hypothetical questions. Tr. at 153.

Plaintiff's attorney asked the VE if there were sit/stand requirements that would substantially erode an individual's ability to perform full-time work. *Id.* The VE testified the occupational base would be eroded if the individual were completely removed from the work station or were unable to perform her work. Tr. at 154. Plaintiff's attorney asked if the individual's ability to perform the jobs identified would be affected if she had to

shift positions every 10 to 15 minutes. *Id.* The VE testified such a limitation could have some impact on work. *Id.* However, she stated the jobs identified could still be performed if an individual had to change positions every 15 minutes. Tr. at 155.

Plaintiff's attorney then asked if the individual would be able to perform the jobs identified if she required breaks that would take her off task for 15 minutes at a time, four to five times during a work shift. *Id.* The VE stated such a limitation would eliminate the jobs she identified in response to the first two hypothetical questions. *Id.*

Plaintiff's attorney asked if an individual would be allowed to elevate her legs to waist-level in the jobs identified. *Id.* The VE testified that she would not. Tr. at 156.

### 2.     The ALJ's Findings

In his decision dated June 13, 2014, the ALJ made the following findings of fact and conclusions of law:

1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2013.
2.  The claimant has not engaged in substantial gainful activity since December 1, 2008, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).
3.  The claimant has the following severe impairments: vision loss, obstructive sleep apnea, coronary artery disease, diabetes mellitus, gastroesophageal disease, chronic renal failure, uterine fibroid tumor, obesity, and depression (20 CFR 404.1520(c) and 416.920(c)).
4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1526, 416.920(d), 416.925 and 416.926).
5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a). Specifically, the claimant is able to lift and carry up to 10 pounds occasionally and lesser amounts frequently, sit for 6 hours in an 8-hour day, and stand and walk for at least two hours in an eight-hour workday. However, the claimant must be

allowed to alternate between sitting and standing position at thirty-minute intervals throughout the day without leaving the workstation or being off task. In addition, the claimant can occasionally climb ramps or stairs, but never climb ropes, ladders, or scaffolds. The claimant can frequently balance, and occasionally stoop, kneel, crouch, and crawl. The claimant must avoid concentrated exposure to extreme cold and heat, and moderate exposure to hazardous machinery and unprotected heights. Visually, the claimant is limited to occupations requiring only frequent, not constant, work with small objects/print or objects requiring detailed fine visual acuity, with small objects defined as objects smaller than a small paper cup. The claimant is limited to work that is simple, routine, and repetitive tasks in a work environment free of fast paced production requirement, and involving only simple, work related decisions, with few if any, work place changes.

6.   The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.   The claimant was born on October 5, 1979 and was 29 years old, which is defined as a younger individual age 18–44, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.   The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.   Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.  The claimant has not been under a disability, as defined in the Social Security Act, from December 1, 2008, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Tr. at 19–30.

II.   Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)   the ALJ did not properly assess Plaintiff's ability to perform jobs existing in significant numbers; and

2)      the ALJ did not adequately consider all of Plaintiff's restrictions in determining her RFC.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

A.     Legal Framework

1.     The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[1] (4) whether such

---

[1] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to

impairment prevents claimant from performing PRW;[2] and (5) whether the impairment prevents her from doing substantial gainful employment. *See* 20 C.F.R. §§ 404.1520, 416.920. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. §§ 404.1520(a)(4), 4167.920(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, §§ 404.1520(a), (b), 416.920(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the

---

prevent all gainful activity. 20 C.F.R. §§ 404.1525, 416.925. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that her impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. §§ 404.1526, 416.926; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[2] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. §§ 404.1520(h), 416.920(h).

regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must

carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.     Analysis

1.     Vocational Evidence

a.     Conflicts Between VE Testimony and the *DOT*

Plaintiff argues the ALJ erroneously found that the VE's testimony was consistent with the *DOT*, despite the ALJ's assessment of non-exertional limitations that were not identified in the *DOT* descriptions of the jobs provided. [ECF No. 18 at 21]. She further maintains that the ALJ did not properly analyze the conflicts between the VE's testimony and the information contained in the *DOT*, particularly with respect to a sit/stand option. *Id.* She contends that the VE's identification of the job of addresser, as a job she could perform in response to the ALJ's hypothetical, conflicted with the *DOT* because the job is described in the *DOT* as requiring "constant" near acuity. *Id.* at 30.

The Commissioner argues that the ALJ complied with the requirements of SSR 00-4p by inquiring about a conflict between the VE's testimony and the *DOT* and relying upon the VE's testimony. [ECF No. 20 at 12]. She maintains that there was no conflict between the VE's testimony and the *DOT* because the VE testified that the *DOT* did not reference a sit/stand option. *Id.* at 13.

35

The provisions of 20 C.F.R. §§ 404.1566(d) and 416.966(d) provide that the ALJ should take administrative notice of job information contained in the *DOT*. Furthermore, SSR 00-4p indicates that "we rely primarily on the *DOT* (including its companion publication, the *SCO*) for information about the requirements of work in the national economy." In some cases, ALJs solicit testimony from VEs to address how particular restrictions affect claimants' abilities to perform specific jobs. 20 C.F.R. §§ 404.1566(e), 416.966(e). Because VEs' opinions sometimes conflict with the information contained in the *DOT*, the SSA promulgated SSR 00-4p to explain how these conflicts should be resolved. The ALJ has an affirmative responsibility to ask about any possible conflict between the VE's testimony and the information provided in the *DOT*. SSR 00-4p. Before relying on a VE's testimony to support a disability decision, the ALJ must "identify and obtain a reasonable explanation for any conflicts between occupational evidence" testified to by the VE and the information contained in the *DOT* and *SCO*. *Id.* The ALJ must then explain in the determination or decision how any conflict that has been identified was resolved. *Id.*

In *Fisher v. Barnhart*, 181 F. App'x 359, 365 (4th Cir. 2006), the court indicated that it did not expect ALJs to uncover and resolve all conflicts between the *DOT* and a VE's testimony, but only "apparent conflicts." This court articulated that "[t]he question, then, is whether there was a conflict between the VE's testimony and the *DOT* that was so apparent that the ALJ should have picked up on it without any assistance." *Acevedo ex rel. Acevedo v. Colvin*, No. 0:12-2137-TMC, 2014 WL 197738, at *5 (D.S.C. Jan. 16, 2014).

i.     Sit/Stand Option

The *DOT* does not address the sit/stand option, and its silence has been construed in some cases as a conflict with the *DOT* and in other cases as not being irreconcilable with the *DOT*. *See Novak v. Commissioner of Social Sec. Admin.*, No. 9:08-2687-HFF, 2009 WL 1922297, at *2 (D.S.C. Jun. 30, 2009) (rejecting the Commissioner's argument that the VE's testimony regarding the sit/stand option addressed a void in the *DOT*, but did not create a conflict with the *DOT* as contemplated in SSR 00-4p), citing *Brown v. Astrue*, No. 3:07-2914, 2009 U.S. Dist. LEXIS 26683 at *37 (D.S.C. Mar. 30, 2009) ("Nevertheless, because the VE did rely on the sedentary jobs cited by the VE, the ALJ needed to further develop the record with respect to any inconsistencies between the Plaintiff's ability (or inability) to perform the sedentary jobs as described in the *DOT*, e.g., whether the particular jobs provided for a sit-stand option even those not described as such in the *DOT*."); *see also Coley v. Colvin,* No. 6:14-1702-JMC, 2015 WL 5602606, at *14 (D.S.C. Sept. 23, 2015) ("However, upon remand, the Commissioner should take into consideration the plaintiff's remaining allegations of error: the ALJ . . . failed to acknowledge that the vocational expert's testimony conflicted with the *DOT* because the plaintiff's RFC did not allow her to perform the sitting generally required of sedentary work and unskilled, sedentary occupations generally cannot be performed with the need for a sit/stand option."). *But see Thompson v. Astrue*, 2010 WL 3878729, at*4 (D.S.C. Jun. 16, 2010), *adopted by* 2010 WL 3880047, *affirmed by* 442 Fed. Appx. 804 (4th Cir. 2011), ("Because the *DOT* does not address the availability of a sit/stand option, it was perforce not irreconcilable with the VE's testimony"), citing *Zblewski v. Astrue*, 302 Fed.

37

App'x 488, 494 (7th Cir. 2008) ("Because the *DOT* does not address the subject of sit/stand options, it is not apparent that the [sit/stand] testimony conflicts with the *DOT*"); *Corbett v. Barnhart*, No. 1:04-241, 2006 WL 5527015, at *62 (N.D.W.Va. Mar. 24, 2006) (finding that "the lack of a sit-stand option in the *DOT* does not conflict with the VE's testimony that certain jobs would be available with a sit-stand option in the national economy"); *Melvin v. Astrue*, No. 1:08-264-SAA, 2010 WL 908495, at *4 (N.D.Miss. Mar. 9, 2010) ("That the *DOT* does not specifically describe a 'sit/stand option' does not necessarily create in [sic] inherent conflict"; thus, ALJ properly relied on VE's testimony). Although *Thompson* was ultimately affirmed by the Fourth Circuit, it appears that the plaintiff did not raise the issue of whether a conflict exists between the *DOT* and VE testimony regarding a sit/stand option on appeal. Therefore, the Fourth Circuit has not addressed whether VE testimony regarding a sit/stand option creates a conflict with the *DOT* as contemplated by SSR 00-4p.

Because the relevant case law does not offer a bright-line rule as to whether a sit/stand option conflicts with the *DOT*, the undersigned has carefully scrutinized the exchange between the VE and the ALJ, as well as the ALJ's decision, to determine whether a conflict with the *DOT*, as contemplated in SSR 00-4p, was presented in this case.

The following exchange occurred between the ALJ and the VE regarding the sit/stand option:

> ALJ:   Has your testimony here today been consistent with the information
>        in the *Dictionary of Occupational Titles* and its companion
>        publications?

VE:     Yes, sir.

ALJ:   Recognizing that the *Dictionary of Occupational Titles* does not address the issue of a sit-stand option.

VE:     Sitting or standing, yes, sir.

ALJ:   Could you explain the basis for your testimony in that regard?

VE:     Your honor, the *DOT* does not make reference to sitting or standing. That information was provided with a reasonable degree of vocational certainty as it pertains to my professional knowledge as well as my professional experience in the vocational field, Your Honor.

ALJ:   Okay. And that's based on your observation of the performance of such jobs?

VE:     Yes, sir.

ALJ:   As well as your training and education?

VE:     Yes, sir. Yes, Your Honor.

Tr. at 152–53.

Despite the ALJ's acknowledgment and the VE's testimony during the hearing that the *DOT* did not address a sit/stand option, the ALJ concluded "[p]ursuant to SSR 00-4p," that "the vocational expert's testimony" was "consistent with the information contained in the *Dictionary of Occupational Titles*." Tr. at 29.

In light of the particular evidence presented in this case, the undersigned recommends a finding that the ALJ failed to comply with the requirements of SSR 00-4p. The ALJ met his obligation to ask about possible conflicts between the VE testimony and the information provided in the *DOT*. Had he merely accepted the VE's initial response

that her testimony was consistent with the *DOT*, the undersigned may be persuaded to follow the body of case law that suggests the *DOT*'s silence as to the sit/stand option does not create an inherent conflict with the VE's testimony that jobs may be performed with a sit/stand option. However, the exchange between the ALJ and the VE during the hearing suggests the ALJ recognized the sit/stand option as not being included in the *DOT*'s descriptions of the jobs. *See* Tr. at 152–53. After obtaining testimony from the VE that her opinion regarding the sit/stand option was based on her professional knowledge and experience, the ALJ summarily concluded in the decision that the VE's testimony was consistent with the information contained in the *DOT* without addressing the *DOT*'s silence regarding the sit/stand option or providing the basis for his conclusion that Plaintiff could perform the jobs identified with a sit/stand option. While one may infer that the ALJ accepted the VE's testimony that her opinion regarding the sit/stand option was based on her knowledge, observation, and experience, the ALJ did not say as much and, therefore, did not meet his obligation "to explain the resolution of the conflict irrespective of how the conflict was identified." *See* SSR 00-4p.

### ii.    Job of "Addresser"

Plaintiff argues the ALJ erred in accepting the VE's testimony that she could perform the job of addresser in light of a conflict between the RFC assessed by the ALJ and the *DOT*'s description of the job. [ECF No. 18 at 30]. The ALJ described in the hypothetical to the VE and found in his decision that Plaintiff was restricted to occupations that required "only frequent, not constant, work with small objects/print or objects requiring fine visual acuity." Tr. at 22.

40

The *DOT*'s description of the job of "addresser" provides "Near Acuity: Constantly–Exists 2/3 or more of the time." DICOT 209.587-010 (G.P.O.), 1991 WL 671797.

The undersigned recommends the court find the ALJ erred in failing to identify and resolve an apparent conflict between the VE's testimony that Plaintiff could perform the job of "addresser" and the *DOT*'s description of the job. The ALJ relied upon the VE's testimony that an individual with the restrictions set forth in the RFC he adopted for Plaintiff could perform the job of "addresser." Tr. at 29. However, a review of the *DOT*'s description of the job title reveals a conflict between the job's requirement for constant near acuity and the RFC's limitation to frequent, but not constant, work with small objects or print requiring detailed fine visual acuity. *Compare* DICOT 209.587-010 (G.P.O.), 1991 WL 671797, *with* Tr. at 22. It is not evident from the ALJ's decision that he recognized the discrepancy between the VE's testimony and the *DOT*'s description of the job of addresser. Because this discrepancy was apparent through a review of the *DOT*'s description of the job and because ALJs are to take administrative notice of and rely primarily on the information contained in the *DOT*, the undersigned recommends a finding that the ALJ erred in failing to recognize and resolve the conflict between the VE's testimony and the *DOT* regarding the job of "addresser." *See* 20 C.F.R. §§ 404.1566(d), 416.966(d); SSR 00-4p.

b.    SSR 96-9p

Plaintiff contends the vocational findings conflict with SSRs 83-12 and 96-9p, with regard to the frequency of the need to alternate sitting and standing. [ECF No. 18 at

23]. She also argues the RFC assessed by the ALJ is internally inconsistent in that it includes a sit/stand option at 30-minute intervals, but limits Plaintiff to standing and walking for only two hours in an eight-hour workday. *Id.* at 24. She maintains the sit/stand option is specific in terms of frequency, but unclear as to the duration of time the individual would need to stand. *Id.* at 26.

The Commissioner argues a distinction may be drawn between an option to alternate if desired and a requirement to alternate positions at a particular interval and maintains that the RFC assessed by the ALJ provided for an option to alternate positions at 30-minute intervals, but did not require that Plaintiff alternate positions with such frequency. [ECF No. 20 at 13]. She argues Plaintiff presents no credible proof that she required the ability to alternate between sitting and standing. *Id.* at 13–14.

Plaintiff points to the following language in SSR 83-12, which suggests that the inclusion of a sit/stand option erodes the sedentary occupational base:

> There are some jobs in the national economy—typically professional and managerial ones—in which a person can sit or stand with a degree of choice. If an individual had such a job and is still capable of performing it, or is capable of transferring work skills to such jobs, he or she would not be found disabled. However, most jobs have ongoing work processes which demand that a worker be in a certain place or posture for at least a certain length of time to accomplish a certain task. Unskilled types of jobs are particularly structured so that a person cannot ordinarily sit or stand at will. In cases of usual limitation of ability to sit or stand, a VS ["vocational specialist"] should be consulted to clarify the implications for the occupational base.

The Social Security Administration ("SSA") further recognizes an erosion of the sedentary occupational base with inclusion of a sit/stand option in SSR 96-9p. The Ruling provides that "[t]he extent of the erosion will depend on the facts in the case record, such

as the frequency of the need to alternate sitting and standing and the length of time needed to stand." SSR 96-9p. The Ruling also indicates that the RFC assessment must be specific as to the frequency of the need to alternate positions and provides that it may be useful to consult a VE to determine whether the individual can adjust to other work. *Id.* This court has generally found that the inclusion of a sit/stand option without an indication of its duration and frequency violates the provisions of SSR 96-9p. *See Williams v. Colvin*, No. 3:12-1821-MGL, 2013 WL 3821266, at *3, (D.S.C. July 23, 2013) ("[T]he parameters of the sit/stand option as outlined by the ALJ are not sufficiently clear and cannot be gleaned or implied from other aspects of the record . . . . Thus, remand is appropriate here to determine, in accordance with SSR 96-9p, the frequency of Williams' need to alternate between sitting and standing."); *Proctor v. Astrue*, No. 5:11-311-JFA-KDW, 2012 WL 3843959, at *2 (D.S.C. Sept. 5, 2012) ("Although the ALJ noted that plaintiff requires a sit/stand option, there is no further explanation of the sit/stand option, the limits imposed by it, and whether it was 'at will.' This does not comply with Rule 96-6's [sic] requirement of specificity with regard to frequency.").

The undersigned recommends the court reject Plaintiff's argument that the VE's testimony identifying jobs Plaintiff could perform with a sit/stand option conflicted with SSR 83-12. In *Walls v. Barnhart*, 296 F.3d 287, 291 (4th Cir. 2002), the court found the district court erred in remanding the case based on a perceived contradiction between the VE's testimony and SSR 83-12's reference to the difficulty of finding unskilled jobs that allowed a sit/stand option. The court found that there was no contradiction between SSR

83-12 and the ALJ's finding that the plaintiff could perform a significant number of jobs in the economy and indicated the following:

> The Ruling acknowledges that there are jobs that allow sit/stand options. It directs the agency to consult with a VE to assess the impact of that option on the occupational base. The Ruling does not prescribe a formula for assessing what jobs are available, and the VE's inclusion of sedentary jobs does not mean he disregarded SSR 83-12's recognition that a sit/stand option negatively impacts the number of unskilled jobs available.

*Id.* This court has similarly acknowledged that VE testimony regarding jobs that allow for a sit/stand option is not contradicted by SSR 83-12. *See Burgess v. Astrue*, C/A No. 2:07-3022-CMC-RSC, 2008 WL 4904874, at *5 (D.S.C. Nov. 13, 2008); *Zarkowski v. Barnhart*, 417 F.Supp.2d 758, 767 (D.S.C. 2006). Although SSR 83-12 points out that only a limited number of unskilled, sedentary jobs may be performed with a sit/stand option, it also acknowledges that an individual's ability to perform particular jobs with a sit/stand option may be ascertained through VE testimony. Here, the ALJ solicited the assistance of a VE to determine Plaintiff's ability to perform sedentary jobs with a sit/stand option, which was the proper course of action pursuant to SSR 83-12. Thus, the VE's testimony identifying jobs that could be performed with a sit/stand option did not conflict with SSR 83-12.

The undersigned also recommends the court reject Plaintiff's argument that the ALJ's hypothetical to the VE and ultimate RFC finding regarding the sit/stand option violated the provisions of SSR 96-9p. The ALJ found that Plaintiff could sit for six hours in an eight-hour day, stand and walk for "at least two hours in an eight-hour workday," and "must be allowed to alternate between sitting or standing positions at 30-minute

intervals throughout the day." Tr. at 22. The undersigned finds that the ALJ was sufficiently specific as to the frequency and duration that Plaintiff would be allowed to sit and stand. Had the ALJ indicated Plaintiff could stand and walk for *a maximum of* two hours out of an eight-hour workday, it would have created a conflict with the sit/stand option being provided at 30-minute intervals. However, because the ALJ indicated Plaintiff could stand for *at least* two hours during the workday, the undersigned finds that the ALJ's hypothetical to the VE and the RFC did not conflict with the frequency and duration of the sit/stand option, which would allow Plaintiff to stand for as much as four hours during an eight-hour workday. The undersigned further finds that by indicating that Plaintiff "must be allowed" to alternate between sitting and standing at 30-minute intervals throughout the workday, the ALJ provided for Plaintiff to alternate positions at her own discretion, provided she maintained one position for at least 30 minutes at a time. Therefore, the ALJ's hypothetical was specific with regard to the duration of the sit/stand option and allowed for a frequency at will, which has consistently been upheld as meeting the requirements of SSR 96-9p. *See Green v. Colvin*, 2015 WL 5602623, at *3 (D.S.C. Sept. 23, 2015) (determining the Magistrate Judge "properly concluded that no greater specific frequency is required when the sit/stand option is 'at will'"); *Pierpaoli v. Astrue*, No. 4:10-2401-CMC-TER, 2012 WL 265023, at *3 (D.S.C. Jan. 30, 2012 (finding an at will sit/stand option satisfies the requirements of SSR 96-9p because it "necessarily implies that it is as needed and no further specificity is required").

Despite the undersigned's recommendations regarding SSRs 83-12 and 96-9p, it is impossible to overlook the fact that the ALJ failed to recognize in his decision that the

VE's testimony was based upon evidence outside the *DOT* and that the ALJ failed to acknowledge the basis for his findings that could not be explained by the *DOT* alone. Furthermore, if we are to interpret the sit/stand requirement as allowing for up to four hours of standing/walking, which is indicated by an ability to alternate between sitting and standing at 30-minute intervals throughout the workday, this creates an inherent conflict with the *DOT*'s descriptions of the jobs as sedentary[3] because it requires more than occasional standing and walking. While this court has repeatedly recognized the ALJ's ability to rely on evidence from a VE that is contraindicated by the plain language of SSR 83-12 and to include and rely upon VE testimony that addresses a sit/stand option with a specific duration and frequency as required by SSR 96-9p, the court cannot affirm a decision that lacks adequate support. Therefore, because the ALJ failed to explain the basis for his findings regarding the frequency and duration of the sit/stand option in accordance with SSR 00-4p, the undersigned recommends a finding that his decision was not supported by substantial evidence.

---

[3] The SSA uses the same definitions for sedentary, light, medium, heavy, and very heavy work as those used in the *DOT*. 20 C.F.R. §§ 404.1567, 416.967. Sedentary work is defined as follows:

> Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

*Id.*

2.     RFC

Plaintiff argues the ALJ did not explain his RFC assessment as required by SSR 96-8p. [ECF No. 18 at 27].

The Commissioner argues the ALJ complied with the provisions of SSR 96-8p in assessing Plaintiff's RFC. [ECF No. 20 at 15–16]. She argues the ALJ properly relied upon Plaintiff's ability to perform part-time work to suggest she was capable of performing more work. *Id.* at 17. She maintains the ALJ properly cited Plaintiff's daily activities to support his conclusion that Plaintiff was not disabled. *Id.* Finally, she argues Plaintiff's symptoms were not constant and did not preclude Plaintiff from engaging in significant activities. *Id.* at 18.

To properly assess a claimant's RFC, the ALJ must ascertain the limitations imposed by her impairments and determine her work-related abilities on a function-by-function basis. SSR 96-8p. This typically requires that the ALJ consider the claimant's ability to sustain work-related activities over an eight hour day and five-day work week or an equivalent work schedule. *Id.* "The RFC assessment must include a narrative discussion describing how all the relevant evidence in the case record supports each conclusion and must cite specific medical facts (e.g., laboratory findings) and non-medical evidence (e.g., daily activities, observations)." *Id.* The ALJ must also consider and explain how any material inconsistencies or ambiguities in the record were resolved. *Id.* Relevant evidence includes medical history, medical signs and laboratory findings, the effects of treatment, reports of daily activities, lay evidence, recorded observations, medical source statements, effects of symptoms that are reasonably attributed to the

medically-determinable impairment, evidence from attempts to work, need for structured living environment, and work evaluations, if available. *Id.* The Fourth Circuit recently held that "remand may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015), citing *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013).

Plaintiff specifically alleges that the ALJ's RFC assessment failed to adequately consider three of her impairments, and the undersigned considers each in turn.

### a.    Visual Impairment

Plaintiff argues the ALJ failed to explain how a limitation to frequent, as opposed to constant, fine visual acuity accommodated her severe impairment of vision loss. [ECF No. 18 at 28]. She maintains the restriction did not adequately accommodate her blurred vision, worsened visual acuity over time, and diagnosis of macular edema with an increase in thickening. *Id.* at 30.

The Commissioner maintains the evidence did not support a greater visual restriction than that assessed by the ALJ. [ECF No. 20 at 16].

The undersigned recommends the court find that the visual limitations assessed by the ALJ were supported by the record. The evidence reflects a waxing and waning of Plaintiff's visual symptoms and a series of procedures designed to reduce Plaintiff's vision problems. Tr. at 615, 622–27, 630, 634, 699, 908, 910, 919, 922, 929, 932, 1006. Despite Plaintiff's complaints and diagnosis, her vision was assessed as being 20/30

bilaterally, at its worst. *See* Tr. at 932. Plaintiff demonstrated high ocular pressure during some visits, but her ocular pressure reduced in response to Avastin injections and Xalatan. *See* Tr. at 910, 919, 929. Although Plaintiff correctly asserts that Dr. Marcus observed a mild increase in noncentral thickening in both of her eyes during a visit in January of 2013 and that she complained of blurred vision to Dr. Muniz the next month, nothing in the record suggests a greater degree of restriction to her vision than that assessed by the ALJ. *See* Tr. at 932, 1006. In fact, Plaintiff testified at the second hearing that her vision was sometimes, but not often, blurred and indicated that she was likely to experience blurred vision when constantly looking at something. Tr. at 135. In light of the record, including Plaintiff's testimony, the undersigned recommends the court find that substantial evidence supported the ALJ's restriction to "occupations requiring only frequent, but not constant, work with small objects/print or objects requiring detailed fine visual acuity."

b.    Gastroesphageal Disease

Plaintiff argues the ALJ did not account for limitations that resulted from her gastroesophageal disease. [ECF No. 18 at 31]. The Commissioner maintains that Plaintiff's gastroesophageal disease did not affect her ability to perform her part-time job and that Plaintiff did not cite it as an explanation for her inability to increase her work hours. [ECF No. 20 at 17].

The ALJ acknowledged that Plaintiff reported recurrent and intermittent vomiting in January 2010 and that "[t]he record reflected some increased gastric symptoms with changes in diabetic medications." Tr. at 24.

The undersigned recommends the court find that the ALJ adequately considered Plaintiff's gastroesophageal disease, but that the record did not support greater restrictions than those he assessed. The record reflects that Plaintiff had a history of nausea and vomiting associated with gastroesophageal disease and changes in medication. *See* Tr. at 647 (Plaintiff informed Dr. Conger that she had been vomiting two to three times per week over the prior two-year period), 731 (Plaintiff reported nausea and Dr. Vaughters indicated the nausea was a result of Plaintiff's Victoza dosage being increased too quickly), 765 (Plaintiff complained of epigastric pain and regurgitation), 769 (Plaintiff was diagnosed with H. pylori gastritis), 781 (Dr. Muniz observed Plaintiff had vomit on her shoes and prescribed Phenergan to treat nausea), 823 (upper endoscopy showed Grade A reflux esophagitis, hiatal hernia, and nonbleeding erythematous gastropathy), 825 (Plaintiff presented to ER with difficulty keeping down fluids). However, Plaintiff's complaints to her doctors of nausea, vomiting, and gastric distress occurred in 2010 and 2011 and generally resolved after she was treated for H. pylori infection. *See* Tr. at 815 (Plaintiff tested negative for H. pylori infection following treatment), 816 (Plaintiff reported no dysphagia or other complaints). Although Plaintiff stated during the 2012 hearing that her medications made her vomit every morning and sometimes in the afternoon, she did not testify to experiencing frequent vomiting at the 2014 hearing. *Compare* Tr. at 76–77, *with* Tr. at 122–48. Furthermore, Plaintiff did not testify that gastrointestinal problems interfered with her abilities to perform part-time work or to increase her work hours. *See* Tr. at 124, 134–35. In light of a record that failed to reflect persistent complaints associated with gastrointestinal disease after 2011 or

recent testimony from Plaintiff that she experienced gastrointestinal problems that interfered with her ability to work or created a need for frequent breaks, the undersigned recommends the court find the ALJ did not err in failing to include additional restrictions in the RFC to address effects of Plaintiff's gastroesophageal disease.

c.     Diabetes Mellitus

Plaintiff argues the ALJ did not explain his determination that her diabetes was controlled and that his conclusion was not supported by the record. [ECF No. 18 at 32–34]. The Commissioner maintains the record supports the ALJ's finding that Plaintiff had problems with compliance with her diabetes treatment and that Plaintiff's noncompliance was relevant to the disability determination. [ECF No. 20 at 16]. She contends Plaintiff did not assert that her diabetes prevented her from working more hours in her part-time job. *Id.* at 17.

The ALJ found that Plaintiff's diabetes and related symptoms "were stable with acute difficulties associated with noncompliance." Tr. at 23. Later in the decision, he wrote "[t]he record continued to reflect fluctuating blood sugars and A1c levels," but "[t]he treatment records indicated no evidence of decreased sensation in the extremities, progressive end organ disease, or glucose events requiring acute hospitalization." Tr. at 24. The ALJ found that "[o]verall, the claimant's conditions and symptoms responded well to medication therapy, but there was significant evidence of pervasive and recurrent noncompliance." Tr. at 28. Finally, he indicated "[m]ore recent records reflected better follow up care, with routine refills on medication and generally unremarkable clinical

findings" and determined the evidence did not support a finding that Plaintiff "was incapable of all work activity." *Id.*

Physicians' assessments and lab work frequently indicated Plaintiff to have high A1C levels and a diagnosis of uncontrolled diabetes mellitus. *See* Tr. at 477, 650, 651, 712, 733, 772, 781, 884, 892, 947, 991, 1007, 1021, 1028, 1029. However, Plaintiff's physicians also frequently noted Plaintiff to be noncompliant in failing to exercise, follow a proper diet, test her blood sugar, follow up for care, or take her medications as directed. *See* Tr. at 518, 605, 702, 838, 876, 997, 1005, 1029, 1038. Contrary to Plaintiff's assertion, the ALJ did not characterize her diabetes as controlled, but rather noted that her symptoms stabilized when she was following her physicians' orders, which is consistent with the evidence of record. *Compare* Tr. at 24 (ALJ noted that Plaintiff's "symptoms improved with administration of the same medications and dosage" during hospitalization that "she was supposed to be taking at home;" indicated that in January 2010, Plaintiff's A1C was 10.7, which was consistent with "some improvement in long term diabetic control;" and pointed out that "the record reflected a good response to diabetic medications, with A1c decreasing to 8.6% from a previous high of 12.9%"), *with* Tr. at 731 (improved blood sugar on Victoza), 838 (blood sugar improved with oral medications during hospitalization), 849 (Plaintiff reported improved blood sugar readings and no new complaints), 903 (Plaintiff's blood glucose improved while she was required to keep a blood glucose log). The ALJ also pointed to the absence of some symptoms typically associated with severe and uncontrolled diabetes mellitus. *See* Tr. at 24 ("The treatment records indicated no evidence of decreased sensation in the extremities, progressive end organ disease, or glucose events requiring acute hospitalization.").

Although Plaintiff submits that the ALJ should have included in the RFC assessment the ability to take frequent breaks as a result of diabetes mellitus, the only evidence in the record that suggests Plaintiff required frequent breaks was her testimony.

*See* Tr. at 76, 82, 99, 140, 142, 143. In assessing the credibility of Plaintiff's testimony, the ALJ appropriately relied upon Plaintiff's noncompliance. *See* Tr. at 23 (the ALJ noted that "the claimant reported that she had not taken her diabetic medication in months (Exhibit 1F/13)" and "[t]he record failed to reflect regular follow up, despite the claimant's complaints and referrals for further treatment"), 24 (the ALJ pointed out that "in June 2009, the claimant again reported she had been out of medications for three months;" stating that in September 2011, "[t]he claimant was admitted with elevated blood pressure and blood glucose," but her "symptoms improved with administration of the same medications and dosage she was supposed to be taking at home;" and acknowledging that "[t]he claimant admitted she did not follow her diet, did not check her home blood sugars, and did not exercise regularly. (Exhibit 2F/1–3)."), 25 (indicating that "[r]ecords in 2012 noted the claimant's ongoing noncompliance with continued symptoms. (Exhibit 33F)"), 26 (noting that "the record reflected ongoing problems with medication compliance"); *see also* SSR 96-7p ("the individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints, or if the medical reports or records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure").[4] The ALJ also rejected Plaintiff's testimony that she required frequent rest periods based on her daily activities.

---

[4] The undersigned notes that Plaintiff did not raise the ALJ's assessment of her credibility in her brief. However, to the extent that Plaintiff may argue that the ALJ did not consider her reasons for noncompliance in accordance with SSR 96-7p, the undersigned notes that neither the medical evidence nor Plaintiff's hearing testimony offers reasons for her noncompliance, aside from a brief reference to her not understanding dietary principles, which Dr. Muniz subsequently discussed with her at length. *See* Tr. at 62–104, 122–48, 518, 785.

*See* Tr. at 26 (noting that Plaintiff performed simple cooking for meals and part-time work; acknowledging that "in addition to her minor child, she lived with and provided some care for additional children" and pointing out that Plaintiff "continued to be interested in getting pregnant"), 27 ("in March 2013, the claimant reported she was attending school. (Exhibit 34F)"); *see also* SSR 96-7p (daily activities are among the kinds of evidence the adjudicator must consider in addition to the objective medical evidence when assessing the credibility of an individual's statements). Finally, the ALJ pointed to inconsistencies between Plaintiff's more recent statements to her physicians and her hearing testimony as a reason for finding her statements to be less than fully credible. *See* Tr. at 27 ("Notably, more recent treatment records were drastically inconsistent with the claimant's testimony. The claimant denied fatigue, difficulty sleeping, chest pain, palpitations, edema, dyspnea on exertion, nausea, heartburn, foot pain, leg pain, muscle weakness, and depression. Physical examinations were generally unremarkable, and medications were routinely refilled. (Exhibit 39F). This was in drastic contrast to the claimant's testimony, reporting that her conditions and symptoms had worsened over the prior two years.").

In sum, the record reflects Plaintiff to have a history of uncontrolled diabetes mellitus and to be limited as a result of the impairment, but the undersigned recommends the court find the ALJ relied upon substantial evidence to determine that diabetes mellitus did not limit Plaintiff any more so than indicated in the assessed RFC. Nevertheless, the undersigned acknowledges that Plaintiff will likely present additional medical records on remand, which may make it necessary for the ALJ to reassess her RFC.

III.     Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence. Therefore, the undersigned recommends, pursuant to the power of the court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions under sentence four of 42 U.S.C. § 405(g), that this matter be reversed and remanded for further administrative proceedings.

IT IS SO RECOMMENDED.

October 29, 2015                          Shiva V. Hodges
Columbia, South Carolina                  United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).